1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT
9                      FOR THE DISTRICT OF ARIZONA
10
11  Diego Lerma,                        )   No. CV 12-518-TUC-FRZ (CRP)
                                        )
12           Plaintiff,                 )   **REPORT & RECOMMENDATION**
                                        )
13  vs.                                 )
                                        )
14                                      )
    City of Nogales; et. al,            )
15                                      )
             Defendants.                )
16                                      )
    _____)
17

18       Plaintiff has filed the instant action arising out of his arrest by Nogales Police and

19  interaction with Nogales EMTs prior to arrest. Plaintiff alleges violation of 42 U.S.C. § 1983

20  and 42 U.S.C. §12131-12134 ("ADA"), and he also alleges state law claims of: assault,

21  battery, negligence, inadequate training, negligent supervision, intentional infliction of

22  emotional distress, vicarious liability, and exemplary damages. (First Amended Complaint

23  ("FAC") (Doc. 77)).  Defendants have filed a Motion for Summary Judgment on all claims.

24  (Doc. 96).  For the following reasons, the Magistrate Judge recommends that the District

25  Court, after its independent review, grant in part and deny in part Defendants' Motion for

26  Summary Judgment.

27

28

**FACTUAL BACKGROUND**

Plaintiff has epilepsy and has suffered from seizures since he was about 14 years old. (Plaintiff's Statement of Facts[1] ("PSOF") (Doc. 103), Exh. 8, p. 7; Plaintiff's Supplement to Statement of Facts ("PSSOF") (Doc. 104), Exh. 20, pp. 10-11 (Dr. Labiner has been treating Plaintiff for over 20 years for "refractory epilepsy, epilepsy that's not responding favorably to medication.")). At the time of the incident at issue, Plaintiff was 39 years old, 6'2", and weighed over 220 pounds. (Defendants' Statement of Facts ("DSOF") (Doc. 97), ¶27; PRDSOF, ¶27).

On July 12, 2011 at 5:51 p.m., a Nogales Fire Department ambulance was dispatched to the area of a Subway restaurant in response to 911 call from Subway employee, David Velarde reporting that a male customer, later identified as Plaintiff, was on the floor "having like a seizure[]" and a few minutes later got up and left Subway and went around to the back of a shopping center. (DSOF, ¶1-3, 14;  PRDSOF, ¶¶1-3, 14; PSOF, Exh. 1, pp. 21-22, 26, 72). Velarde followed Plaintiff outside the Subway, and when the ambulance came on scene, pointed him out to the EMTs in the ambulance. (PSOF, Exh. 1, pp.17, 20-22).  Velarde testified that Plaintiff ran around some parked cars, "and the ambulance drove around the cars trying to talk to him." (*Id.* at p. 22). EMT George Boyd, who was driving the ambulance, drove toward Plaintiff and inquired in English and Spanish whether "he needed medical attention or if...he had had a seizure...and he didn't respond.....So we were like well maybe this isn't the guy." (DSOF, Exh. 2, pp. 39-40, 42; *see also id.* at pp. 43-44 (Plaintiff never spoke to Boyd, and Boyd and his partner did not get out of the ambulance)). Concluding that he was unable to locate the person who was the  subject of the 911 call, EMT Boyd and his partner left the area without making any further inquiry. (*Id.* at p. 44, 93).

---

[1]Plaintiff filed a "Response to Defendants' Separate Statement of Facts" (Doc. 103, ¶¶ 1-73, at pp. 1-6), which also includes a separate section captioned "Plaintiff's Additional Facts" (Doc. 103, ¶¶1-29, at pp. 6-8).  Plaintiff's Response to Defendants' Separate Statement of Facts is referred to as "PRDSOF" and Plaintiff's Additional Facts are referred to as "PSOF".

1    After Plaintiff's encounter with EMT Boyd, Plaintiff entered La Cinderella

2  Department Store at La Mariposa Shopping Center and walked through the store to the back

3  warehouse that is off-limits to customers. (DSOF, ¶¶17, 20; PRDSOF, ¶¶17, 20; *see also*

4  DSOF, ¶¶22 (La Cinderella is less than 1/4 mile from Subway); PRDSOF, ¶22). La

5  Cinderella employees contacted 911, and the 911 dispatcher stated in her dispatch about the

6  incident that the suspect appeared "disoriented." (DSOF, ¶¶19, 21; PSOF, ¶¶19, 21).

7  Afterwards, the dispatcher came back on the radio to state:

8 
9 
> Just for information, a couple of minutes ago we had a medical call at the Subway, a disoriented male subject. Might be the same one. Possibly wearing blue shirt and Levis.

10  (PSOF, Exh. 14, pp. 81-82 (dispatch made at 18:04:43 p.m.)).

11    At approximately 6:04 p.m., Nogales police offices responded. (DSOF, ¶20;

12  PRDSOF, ¶20). It appears that Officer Roberto Fierros and Detective Jose Pimienta may

13  have arrived first and were later joined by Officers Raymundo De La Ossa and Gaston

14  Ortega.

15    Upon entering the store, which had been locked by La Cinderella employees who had

16  vacated the premises, Officer Fierros announced "Nogales Police" loudly many times, and

17  he ordered anyone in the premises to come out. (DSOF, ¶25; PRDSOF, ¶25). With firearms

18  drawn, the officers began searching the store and discovered Plaintiff partially concealed

19  behind some shelves in the warehouse area. (DSOF, ¶26; PRDSOF, ¶26). Plaintiff was

20  wearing an untucked tank-top shirt that hung over the waistline of his jeans, and officers did

21  not know whether he was armed. (DSOF, ¶¶28-29; PRDSOF, ¶¶28-29). At no time did

22  officers see that Plaintiff possessed a weapon. (PRDSOF, Exh. 7, p. 166).

23    Officer Fierros identified himself to Plaintiff as a police officer and ordered Plaintiff

24  repeatedly to show himself and put his hands up. (DSOF, ¶30; PRDSOF, 30). Officer

25  Fierros testified that Plaintiff "didn't show a response. He did not talk back to me. He did

26  not do as I told, to show me his hands and to come on out from where he was hiding....he did

27  not show me a sign. He did not make any attempt at communicating back with me." (DSOF,

28  Exh. 5, p. 30; *see also id.* at pp. 28-29, 33). Instead, Plaintiff "continued looking up. He

1    would make eye contact with [Officer Fierros], just looking straight ahead...and he'd put his

2    head down and he wouldn't show any movement.  His hands stayed clenched." (*Id.* at p. 30).

3    Officer Fierros also testified that Plaintiff's behavior and physical characteristics seemed "out

4    of character...", in that he usually does not see such behavior when effectuating an arrest.

5    (*Id.* at p.29).  According to Officer Fierros, Plaintiff stood partially behind a shelf, he was

6    sweating profusely, his breathing was labored, his pupils were dilated, his fists were clenched

7    so tightly that sweat was dripping from his hands, and he had a smile-like expression.

8    (DSOF, ¶32; PRDSOF, ¶32).  It never crossed Officer Fierros' mind that Plaintiff might be

9    suffering from a disability.[2]  (PSOF, Exh. 5, pp. 43-44).

10        Officer Fierros called out for a taser, and Detective Jose Pimienta took Officer

11    Fierros' taser, model # X26, from Officer Fierros' gear belt.  (DSOF, ¶¶33-34; PRDSOF,

12    ¶¶33-34 & Exh. 9).  Plaintiff suddenly ran away from Officer Fierros toward the south wall

13    of the store.  (DSOF, 35; PRDSOF, 35).  Detective Pimienta ran parallel to Plaintiff the next

14    aisle over and when they met up at end of their respective aisles, Plaintiff turned and ran back

15    toward Officer Fierros.  (DSOF, Exh. 5, pp. 36-39; DSOF, Exh. 6, pp. 123-24).  Officer

16    Fierros testified that Plaintiff, who is significantly larger than he is,  was running directly at

17    him in an aggressive manner, "with a lot of energy..." and with fists still clenched.  (DSOF,

18    Exh. 5, p. 38 (Officer Fierros braced himself for "a tackle and a strike, a hit" from Plaintiff

19    because he is "significantly bigger than me, weighs much more than me....."); *see also* DSOF,

20    Exh. 6, p.121).  At this time, Detective Pimienta was running behind Plaintiff yelling "police,

21    police  stop", and "taser, taser, taser...."  (DSOF, Exh. 6, p.121 & Exh. 5, 37).  Because

22

23    _____

24        [2]Plaintiff challenges the officers' testimony that he was running at Officer Fierros.
     According to Plaintiff's treating physician, David Labiner, M.D., the literature substantiates
25    the conclusion that most epileptics are non-confrontational and will not "seek out to do
     somebody harm in the aftermath of a seizure."  (PSSOF, Exh. 20, p. 52; *see also id.* at p. 36
26    ("trying to restrain somebody who is in a postictal state can actually cause nondirected
     violent behavior.  So the advice is to gently coax...[d]on't try to restrain...."); *id.* at p. 68 (an
27    epileptic in a postictal state is  not likely to seek out confrontation or commit acts of violence
     directed against anyone)).
28

1   Plaintiff was running "at full speed going directly towards..." Officer Fierros, Detective

2   Pimienta thought if he did not stop Plaintiff, Plaintiff was "going to run [Officer Fierros]

3   over. He's going to injure [Officer Fierros]. So I deploy the taser [in dart-mode] after I say

4   taser, taser, taser." (DSOF, Exh. 6, pp. 120-21). The taser's probes struck Plaintiff in his

5   back. (DSOF, ¶42; PRDSOF, ¶42). Before making any contact with Officer Fierros,

6   Plaintiff fell on his stomach and said,"okay, okay, okay, okay" which Detective Pimienta

7   took as Plaintiff's willingness to comply with their commands. (DSOF, Exh. 6, pp. 127-28).

8   Detective Pimienta removed the cartridge from the taser, but did not remove the darts from

9   Plaintiff. (*Id.*). Officer Fierros issued several commands to  Plaintiff, including to put his

10  arms behind his back and when Plaintiff failed to do as instructed, Detective Pimienta placed

11  the cartridge in the taser and deployed it a second time. (*Id.*).

12          Thereafter, Plaintiff moved into a fetal position and continued not to respond to

13  Officer Fierros' commands, and Detective Pimienta deployed the taser a third time. (*Id.* at

14  129). Plaintiff straightened out his body and Officer Fierros grabbed his left arm in an effort

15  to get it behind Plaintiff's back. (*Id.* at pp. 134-35 (Officer Fierros had control of Plaintiff's

16  left arm as the third taser cycle ended)). Officer Fierros directed Plaintiff to put his right arm

17  behind his back, and when Plaintiff did not do this, Detective Pimienta deployed the taser a

18  fourth time. (*Id.* at p. 135). By this time, Officer De La Ossa had arrived, and he grabbed

19  Plaintiff's right arm and put it behind Plaintiff's back. (*Id.; see also* DSOF, Exh. 7, p. 44

20  (Officer De La Ossa testified that once Officer Fierros took Plaintiff's "left hand down and

21  cuffs him, I go down and try to take his right hand down.")). Detective Pimienta testified

22  that: "By then, the [taser's five-second cycle] is ending...[Plaintiff] straightens out his arms

23  and he closes the gap, making it hard to put the handcuffs on, especially in a confined area

24  where we're at. I'm seeing two officers trying to struggle to get the handcuffs. He's not

25  complying, he's not helping. That's when I tased the final time." (DSOF, Exh. 6, p. 135; *see*

26  *also id.* at p. 129 (five-second cycle); DSOF, Exh. 14, p. 59). Detective Pimienta testified

27  that Plaintiff's hands were behind his back (one held by Officer Fierros and one by Officer

28  De La Ossa) before he deployed the taser a fifth time. (DSOF, Exh. 6, p. 138). Detective

1    Pimienta stated that when Plaintiff rolled over onto his back, after the fifth taser, he was

2    handcuffed. (*Id.* at p. 140).  The taser record shows it was deployed five times as follows:

3    18:11:08; 18:11:15; 18:11:24; 18:11:32; and 18:12:04.(DSOF, ¶64; PRDSOF, ¶64).

4            Plaintiff was placed under arrest for criminal trespass, disorderly conduct, and

5    criminal damage for fluorescent light bulbs he broke in the warehouse.  (DSOF, 66;

6    PRDSOF, ¶66). After Plaintiff was *Mirandized*, he told Officer Fierros that he was in the

7    store because he wanted time by himself and he did not come out as directed because he did

8    not know what to do.  (*Id.*).  When asked, Plaintiff denied being under the influence of drugs

9    or alcohol and he denied being mentally ill.  (DSOF, ¶67; PSOF, ¶67).  When the officers

10   asked whether Plaintiff had a medical disability card, he did not show them one. (DSOF, ¶68;

11   PRDSOF, ¶68 (citing PSOF, Exh. 4, Plaintiff contends he left his wallet at Subway)).

12   Plaintiff was not wearing a medical alert bracelet or necklace at the time of the incident.

13   (DSOF, ¶69; PRDSOF, ¶69).  Nor did Plaintiff tell the officers that he was an epileptic.

14   (DSOF, ¶70; PRDSOF, ¶70; *but see* PSOF, Exh. 8, p. 12 (Plaintiff testified that he had told

15   officers he had a seizure disorder just before the fifth taser shot)).   However, Detective

16   Pimienta testified that even if he had known Plaintiff was an epileptic prior to their

17   encounter, "[i]f he wasn't complying,...the same thing would have happened...", and he

18   would have treated Plaintiff the same way.  (PSOF, Exh. 7, p. 185).

19           After the incident, Plaintiff was transported to the hospital where he was diagnosed

20   and treated for a non-displaced fracture of his left elbow.  (DSOF, ¶¶71-72; PRDSOF, ¶¶71-

21   72).

22           Plaintiff does not recall anything from the time he entered Subway until he was on the

23   floor of the warehouse after he had been tasered four times, nor does he remember the pain

24   from the taser.  (DSOF, Exh. 8, pp. 13, 15, 19).  Plaintiff testified that before the final taser

25   shot, he was on his back, some officers were holding him down, another officer was

26   straddling him, and he told them "there's no need to do that, where am I,...what year is

27   this,...you know, have I hurt anyone,... I have a disability, a seizure disorder, there's no need

28   to do that anymore.  And all he did was smile and do it to me again."  (PSOF, Exh. 8, pp. 11-

12; *see also id.* at pp. 12-13 ("I told him there's no need to do that anymore, there's no need to tase me...–because I saw the thing in his hand and I was telling him these things, and all he did was smile and do it to me again."); *id.* at pp. 14, 21).

According to Plaintiff, when the taser was deployed the final time, Detective Pimienta used the "drive stun" mode against the skin of Plaintiff's right shoulder. (DSOF, Exh. 8, pp. 14-15). "Drive stun occurs when the cartridge that propels the probes is removed from the gun and the electrodes on the gun are pressed against the body and the trigger is pulled." (DSOF, ¶61; PRDSOF, ¶61). Drive stun mode is used to cause pain rather than to incapacitate. (PSOF, Exh. 10). For purposes of the instant motion, Defendants "recognize that...[Plaintiff's] claim that he was drive stunned one time must be taken as true." (DSOF, 63; *see also* DSOF, Exh. 6, pp. 45, 64-65; DSOF, Exh. 7, pp. 60-61 (Detective Pimienta and Officer De La Ossa deny using the taser in drive stun mode)).

Plaintiff's physician, Dr. Labiner, testified that with the "complex partial type of seizures..."that Plaintiff suffers, "there is a postictal period where there's anything from some confusion that can be seconds to minutes long to severe confusion that can go on for minutes to hours, fatigue, sleepiness, unusual behaviors in the immediate aftermath. People can look like they're intoxicated from the time they're having a seizure and don't look like they're getting back to normal in this period." (PSSOF, Exh. 20 at p. 34).

**STANDARD**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c)(2). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record]...which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, "a 'judge's function' at summary judgment is not to 'weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton,* __ U.S. __, 2014 WL 1757856, *4 (May 5, 2014) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). Instead, the

1    nonmoving party's evidence is presumed true and all inferences are to be drawn in the light

2    most favorable to that party.  *Eisenberg v. Ins. Co. of North America*, 815 F.2d 1285, 1289

3    (9th Cir. 1987); *see also Tolan,* __ U.S. __, 2014 WL 1757856 at *4 (in deciding a motion

4    for summary judgment, "a court must view the evidence in the light most favorable to the

5    opposing party.") (internal quotation marks and citation omitted).

6         Only disputes over facts that might affect the outcome of the suit will preclude the

7    entry of summary judgment, and the disputed evidence must be "such that a reasonable jury

8    could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248. If the burden

9    of persuasion at trial would be on the nonmoving party, the movant may carry its initial

10   burden of production under Rule 56(c) by producing, "evidence negating an essential element

11   of the nonmoving party's case," or by showing, after suitable discovery, that the "nonmoving

12   party does not have enough evidence of an essential element of its claim or defense to carry

13   its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210

14   F.3d 1099, 1105-1106 (9th Cir. 2000).

15   **VIOLATION OF 42 U.S.C. § 1983 (CLAIM 1).**

16   **EXCESSIVE FORCE.**  Defendants argue that they did not violate Plaintiff's constitutional

17   rights because they did not use excessive force and, even if they did, they are entitled to

18   qualified immunity.

19        "Qualified immunity protects government officials from liability for civil damages

20   insofar as their conduct does not violate clearly established statutory or constitutional rights

21   of which a reasonable person would have known."  *Sheehan v. City and County of San*

22   *Francisco,* 743 F.3d 1211, 1221 (9th Cir. 2014) (citation omitted).  In considering qualified

23   immunity in the context of a motion for summary judgment, "courts engage in a two-pronged

24   inquiry."  *Tolan,* __ U.S. __, 2014 WL 1757856 at *4; *see also Mattos v. Agarano,* 661 F.3d

25   433, 440 (9th Cir. 2011). The first prong requires determination whether "the facts, '[t]aken

26   in the light most favorable to the party asserting the injury, ... show the officer's conduct

27   violated a [federal] right [.]'"  *Tolan,* __ U.S. __, 2014 WL 1757856, at *4 (quoting *Saucier*

28   *v. Katz*, 533 U.S. 194, 201(2001)).  "The second prong of the qualified-immunity analysis

1  asks whether the right in question was 'clearly established' at the time of the violation." *Id.*

2  (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

3      Defendants argue that there is no §1983 violation because there was no use of

4  excessive force.  "When a plaintiff alleges excessive force during an investigation or arrest,

5  the federal right at issue is the Fourth Amendment right against unreasonable seizures.

6  *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The inquiry

7  into whether this right was violated requires a balancing of 'the nature and quality of the

8  intrusion on the individual's Fourth Amendment interests against the importance of the

9  governmental interests alleged to justify the intrusion.' *Tennessee v. Garner,* 471 U.S. 1, 8,

10  105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)...." *Id.  See also Marquez v. City of Phoenix,* 693 F.3d

11  1167 (9th Cir. 2012), *cert. denied,* __ U.S. __, 133 S.Ct. 1468 (2013).  The Ninth Circuit

12  "undertake[s] this inquiry  with great caution making 'allowance[s] for the fact that police

13  officers are often forced to make split-second judgments—in circumstances that are tense,

14  uncertain, and rapidly evolving—about the amount of force that is necessary in a particular

15  situation.'" *Marquez,* 693 F.3d at 1174 (quoting *Graham,* 490 U.S. at 396-97).  Although

16  "the existence of less forceful options to achieve the governmental purpose is relevant,

17  '[p]olice officers ... are not required to use the least intrusive degree of force possible.'" *Id.*

18  (quoting *Forrester v. City of San Diego*, 25 F.3d 804, 807–08 (9th Cir.1994)).

19      In excessive force cases, if the evidence when reviewed in the light most favorable

20  to the plaintiff could support a finding of excessive force, then the defendants are not entitled

21  to summary judgment.  *Smith v. City of Hemet,* 394 F.3d 689, 701 (9th Cir. 2005).  "'Because

22  [the excessive force inquiry] nearly always requires a jury to sift through disputed factual

23  contentions, and to draw inferences therefrom,...[the Ninth Circuit] ha[s] held on many

24  occasions that summary judgment or judgment as a matter of law in excessive force cases

25  should be granted sparingly.'" *Id.* (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir.2002)

26  & citing *Liston v. County of Riverside*, 120 F.3d 965, 976 n. 10 (9th Cir.1997) (as amended))

27  ("We have held repeatedly that the reasonableness of force used is ordinarily a question of

28  fact for the jury.")).  "This is because such cases almost always turn on a jury's credibility

determinations." *Id.*

**NATURE OF THE INTRUSION**.  It is undisputed that Detective Pimienta deployed the taser five times.  Detective Pimienta states that the first time was in dart-mode[3].  Although he does not specify, it appears that the second through fourth taser shots were in dart- mode as well. For purposes of the instant motion, Defendants "recognize that... [Plaintiff's] claim that he was drive-stunned[4] one time [the fifth time] must be taken as true."  (DSOF, ¶63).  The Ninth Circuit has "recognize[d] the important role controlled electric devices like the Taser X26 can play in law enforcement. The ability to defuse a dangerous situation from a distance can obviate the need for more severe, or even deadly, force and thus can help protect police officers, bystanders, and suspects alike."   *Bryan,* 630 F.3d at 826.  In *Bryan,* the Ninth Circuit held the taser "X26 and similar devices when used in dart-mode constitute an intermediate, significant level of force that must be justified by the governmental interest involved." *Id.*   Thus, in Plaintiff's case the first four taser deployments, which were in dart-mode, constituted an intermediate, significant level of force that must be justified by the governmental interest involved.  *See id.*

Although the Ninth Circuit has not specifically identified the level of force used when

---

[3]The Ninth Circuit has explained that in dart-mode the taser:
uses compressed nitrogen to propel a pair of "probes"—aluminum darts tipped with stainless steel barbs connected to the [taser] by insulated wires—toward the target at a rate of over 160 feet per second. Upon striking a person, the [taser] delivers a 1200 volt, low ampere electrical charge ... The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless.
*Mattos,* 661 F.3d at 443 (quoting *Bryan v. MacPherson,* 630 F.3d 805, 824 (9th Cir. 2010)).

[4]"When a taser is used in drivestun mode, the operator removes the dart cartridge and pushes two electrode contacts located on the front of the taser directly against the victim. In this mode, the taser delivers an electric shock to the victim, but it does not cause an override of the victim's central nervous system as it does in dart-mode." *Mattos,* 661 F.3d. at 443 (recognizing "in drive-stun mode, the shock was 'extremely painful.'"). *See also* PSOF, Exh. 10 (Drive-stun mode is used to cause pain or discomfort to promote "pain compliance"); *Harris v. Simental,* 2013 WL 3733429, *7 n.5 (N.D. Cal. July 15, 2013) (drive-stun mode "is apparently a lower setting or lesser application of the taser than the 'dart mode'").

1   a taser is deployed in drive-stun mode, the court has found that deployment of a taser nine

2   times, twice in dart-mode and seven times in drive-stun, while the officer wrestled the subject

3   to into submission "constituted a not-insignificant potential intrusion upon [the subject's]

4   Fourth Amendment rights." *Marquez,* 693 F.3d at 1174; *see also Mattos,* 661 F.3d at 443

5   (stating that the court need not decide what level of force is used when a taser is deployed

6   in drive-stun mode in order to assess the reasonableness of the tasering and holding that the

7   use of a taser in drive-stun mode three times in rapid succession on a pregnant woman during

8   a traffic stop was excessive) (citing *Scott v. Harris,* 550 U.S. 372, 383 (2007)).  Since

9   *Mattos,* district courts in the Ninth Circuit have "assume[d] that the taser use in drive stun

10   mode constituted a somewhat less than intermediate level of force." *Harris,* 2013 WL

11   3733429, *7 n.5; s*ee also Williams v. City of Merced,* 2013 WL 498854, *11 (E.D. Cal. Feb..

12   7, 2013) (same).

13        A taser cycle lasts five seconds.  (DSOF, ¶65; PRDSOF, ¶65).  Here, Defendants

14   deployed the taser in dart-mode  four times, within 2-4 seconds of each other, after the five-

15   second cycle had run; and approximately 27 seconds after the last dart-mode cycle, Plaintiff

16   was tasered in drive-stun mode.  (*See* DSOF, ¶64 (the taser was deployed at 18:11:08;

17   18:11:15; 18:11:24; 18:11:32; and 18:12:04; PRDSOF, ¶64)).  Defendants contend that just

18   before Detective Pimienta deployed the taser on drive-stun mode, Plaintiff was face down

19   on the floor surrounded by four officers, his arms were behind his back with Officer Fierros

20   holding his left arm with his left wrist cuffed, Officer De La Ossa holding his right arm, and

21   Plaintiff straightened his arms out behind him.  (DSOF, Exh. 6, pp. 132, 134-35, 137-39; *see*

22   *also* DSOF, Exh. 7, pp. 44-45 (Officer De La Ossa's testimony that prior to the last taser

23   deployment, Officer Fierros had handcuffed Plaintiff's left hand, and Officer De La Ossa had

24   Plaintiff's right hand, "[a]nd once we have his right and left hand in the back, he's still

25   resisting. So we couldn't cuff him.")).  Detective Pimienta cannot remember whether Officer

26   Fierros or Officer De La Ossa had contact with Plaintiff's arms when he deployed the taser

27   in drive-stun mode.  (DSOF, Exh. 6,  p. 139).  During this fifth cycle, Plaintiff ended up on

28   his back in handcuffs, though Detective Pimienta does not know how Plaintiff came to be on

1   his back.  (*Id.* at p. 140).   Plaintiff claims that before the fifth taser shot, he was on his back

2   and had told the officers that he had a seizure disorder and there was no need to taser him.

3   (PSOF, Exh. 8, pp. 11-14, 21). The evidence supports the conclusion that the four taser

4   deployments in dart-mode made in quick succession, together with  the drive-stun mode

5   deployment and the officers' physical contact with Plaintiff who, after the first taser

6   deployment remained on the floor, "constituted a not-insignificant potential intrusion upon

7   [Plaintiff's] Fourth Amendment rights." *Marquez,* 693 F.3d at 1174.

8   **GOVERNMENTAL INTERESTS AT STAKE**. Next, the Court must balance the Plaintiff's Fourth

9   Amendment interests against the governmental interests, "by looking at (1) how severe the

10   crime at issue is, (2) whether the suspect posed an immediate threat to the safety of the

11   officers or others, and (3) whether the suspect was actively resisting arrest or attempting to

12   evade arrest by flight." *Mattos,* 661 F.3d at 441 (quoting *Deorle v. Rutherford,* 272 F.3d

13   1272, 1279–80 (9th Cir.2001)); *see also Marquez,* 693 F.3d at 1174. "'[T]hese factors,

14   however, are not exclusive. Rather,...[the court must also] examine the totality of the

15   circumstances and consider 'whatever specific factors may be appropriate in a particular

16   case, whether or not listed in Graham.'" *Mattos,* 661 F.3d at 441 (quoting *Bryan*  630 F.3d

17   at 826).

18       Defendants do not specifically discuss the severity of the crime.  Plaintiff persuasively

19   points out that, at most, when the officers "approached and subdued [Plaintiff], the crime was

20   trespassing." (Response (Doc. 102), p. 3).  In addition to trespass, Plaintiff was charged with

21   disorderly conduct and criminal damage because some light bulbs were broken during the

22   arrest, all lower level misdemeanors.  (*Id.* at pp. 3-4).  The charges were dropped two weeks

23   later.  (*Id.*).

24       The employees at La Cinderella reported that Plaintiff appeared disoriented,  he did

25   not threaten them, and they did not feel scared. (PSOF, Exh. 17,  pp.12-13, 16; PSOF, Exh,

26   18,  p.12; PSOF, Exh. 19, p10; *see also* Defendants' Reply, Exh. 1 (Doc. 107-1), pp. 20 (one

27   employee stated that Plaintiff's eyes were glazed and he looked "[a]s if he had been

28   drinking...[or] was sick or [on] drugs.")).  Here, trespassing, as that offense was committed

1   by Plaintiff, cannot be viewed as a severe offenses.  *See Davis v. City of Las Vegas,* 478 F.3d
2   1048, 1055 (9th Cir. 2007) (trespassing and obstructing a police officer were not severe
3   crimes).

4        "Ultimately, the 'most important' *Graham* factor is whether the suspect posed an
5   'immediate threat to the safety of the officers or others.'" *Mattos,* 660 F.3d at 441 (quoting
6   *Smith*, 394 F.3d at 702 (internal quotations omitted)).  In considering whether there was an
7   immediate threat, a "simple statement by an officer that he fears for his safety or the safety
8   of others is not enough; there must be objective factors to justify such a concern.'" *Id.* at 441-
9   42 (quoting *Deorle,* 272 F.3d at 1281).

10       Plaintiff points out that the La Cinderella employee who called 911 said nothing to
11  indicate Plaintiff might be a threat.  He also points out that after the 911 dispatcher
12  announced the call from La Cinderella, she  came back on the radio to state: "Just for
13  information, a couple of minutes ago we had a medical call at the Subway, a disoriented male
14  subject.  Might be the same one.  Possibly wearing blue shirt and Levis."  (PSOF, Exh. 14,
15  pp. 81-82).  Therefore, Plaintiff argues that the officers were on notice that the person at La
16  Cinderella might be the same person who had a recent "seizure."  (Response p. 4).
17  Defendants correctly counter that the dispatcher reported only that the person was
18  "disoriented" and never used the word "seizure." (Reply, p.3). Further, the parties have not
19  cited testimony to indicate whether or not the officers actually heard this dispatch. (*See*
20  PSOF, Exh. 5, p. 20 (Officer Fierros testified he did not recall whether he heard the
21  dispatch.)).

22       When the officers entered the warehouse, they had no confirmation that Plaintiff was
23  the same man who suffered the seizure earlier or what caused that seizure.  Plaintiff blames
24  the EMTs' failure for this;  nonetheless, upon arriving at La Cinderella, the officers, at best,
25  knew they were responding to a call involving a reportedly disoriented male. In the
26  warehouse, they encountered Plaintiff, who is a large man.  His shirt hung over the waist
27  band of his jeans possibly concealing a weapon.  He stood partially concealed behind
28  shelving and he did not respond to  officers' orders to show himself or to show his hands.

Plaintiff was sweating profusely, his breathing was labored, his pupils were dilated, his fists were tightly clenched, and he had a smile-like expression on his face.  He ran at first away from the officers, and when he reached a wall, he turned and ran directly at Officer Fierros, who was smaller than Plaintiff.  The officers contend that Plaintiff did not "comply" with their orders, and Plaintiff argues that he was not wilfully non-compliant, but was instead in a postictal state that prevented him from complying. (*See* PSSOF, Exh. 20, p. 69 (Dr. Labiner testifying that any resistance from an epileptic in a postictal state is not volitional resistance and it "would be a misrepresentation" to suggest that Plaintiff was being intentionally violent while in a postictal state)).

In any event, the officers' actions must be evaluated "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396.  Plaintiff's expert and treating doctor, Dr. Labiner, testified at his deposition that people in a postictal state after an epileptical seizure can appear intoxicated or on drugs, "[t]hey just don't look normal." (PSSOF, Exh. 20, p. 68).  He went on to state: "that's really where the dilemma comes in, because obviously you treat somebody who is intoxicated and potentially a danger to you differently than you would treat somebody else.  And that's why I mentioned earlier that I don't envy law enforcement for having to do that on the fly." (*Id.*).  Plaintiff argues that in a postictal state, he would not have run toward anyone, but away from them.   Dr. Labiner also testified that a person in a postictal state would not act in a confrontational manner and if such person is restrained, he may "thrash out in a nondirected fashion.  Somebody may interpret that as directed if they get their clock cleaned from that...." (Id. at p. 52).

Given the 911 dispatcher's radio communication that the man reported at La Cinderella may be the same one who had been reported earlier in the same area as appearing disoriented, there is a factual question whether the Defendant officers were aware that they might be dealing with someone with epilepsy. As events quickly unfolded, and Plaintiff failed to respond to the officers' orders and ultimately ran at Officer Fierros, who was smaller than Plaintiff, the first taser shot was deployed.  Under these circumstances a

reasonable juror could find that Plaintiff posed an immediate threat to Officer Fierros.

Whether Plaintiff continued to pose an immediate threat by the time the taser was deployed three additional times in dart-mode and a final time drive-stun mode is a more difficult question. A reasonable fact finder could find that the threat to Officer Fierros created by Plaintiff running directly at him was abated after the first taser shot given that Plaintiff fell to the floor and that before the second shot, he was on the floor on his stomach. (*See* PSOF, Exh. 6, p. 65 (Officer De La Ossa testified that when Plaintiff was on the ground, he did not kick, threaten or yell); PSOF Exh. 5, p. 43 (After Plaintiff was on the ground, he never hit or took any deliberate action to hurt Officer Fierros)). Officer De La Ossa testified that by referring to Plaintiff resisting, he meant Plaintiff would not bring his arms together so they could handcuff him. (PSOF, Exh. 6, p. 65).

By the fifth taser shot, Plaintiff alleges he was handcuffed; however, Defendants claim he was not. Instead according to Defendants, Officer Fierros had fastened a handcuff to Plaintiff's left wrist and Officer De La Ossa was trying to subdue Plaintiff's right arm, but the officers were unsuccessful in handcuffing Plaintiff because Plaintiff had straightened out his arms. With his left hand in handcuffs, Plaintiff was on the floor (Defendants state Plaintiff was on his stomach and Plaintiff states he was on his back), Detective Pimienta was sitting on top of him, straddling him, and he was surrounded by three other officers, two of whom had hold of each of his arms. According to the officers, it was difficult to handcuff Plaintiff in such a confined place due to his resistance. The record is clear that several officers were dealing with Plaintiff. *See Beaver v. City of Federal Way,* 507 F.Supp.2d 1137, 1145 (W.D. Wash. 2007) (observing that to the extent the plaintiff posed an "immediate threat" to the officer during the first three taser shots, that threat was significantly diminished when another officer arrived to provide backup, but acknowledging that if plaintiff resisted handcuffing the officer could have fired the taser again or moved to manual methods).

Plaintiff testified that, before the last taser shot, he told the officers that he had a seizure disorder and there was no need to taser him. (PSOF, Exh. 8, pp. 11-14, 21).

Other than Plaintiff straightening out his arms, there is no evidence that he was

resisting.[5]  For example, there is no evidence Plaintiff was struggling to get up.  Further, the officers agree that Plaintiff was not kicking, yelling, or making verbal threats.  (*See* PSOF, Exh. 6, p. 65; PSOF, Exh. 5, p. 43).  It is difficult to say Plaintiff posed an "immediate threat" after the first taser shot, especially given his testimony that before the final taser shot, he told officers there was no need to taser him.

**WHETHER PLAINTIFF WAS ACTIVELY RESISTING ARREST OR ATTEMPTING TO EVADE OFFICERS BY FLIGHT**.  This analysis involves the same facts stated above together with the fact that the warehouse and La Cinderella store were locked, so there was no way for Plaintiff to escape.  While it is arguable that this factor favors Defendants regarding the first taser deployment, it is more debatable as events proceeded to the last taser deployment in that there is no evidence that Plaintiff, other than not giving officers his hands,  attempted to rise, flee or fight.  *See Smith,* 394 F.3d at 702-03 ("To the extent that he physically resisted arrest, defendants acknowledge that it lasted for only a brief time. Although [plaintiff] refused to place both his arms behind his back, he did not attack the officers or their dog. In all, it does not appear that [plaintiff] resistance was particularly bellicose or that he showed any signs of fleeing the area.").  Moreover, Plaintiff states that he was handcuffed before the fifth taser shot and he told officers there was no need to taser him.  Viewing the evidence in the light most favorable to Plaintiff, as the Court must on summary judgment, this factor supports a finding that Plaintiff was not resisting before the last taser deployment.

**TOTALITY OF THE CIRCUMSTANCES**.  Finally, the Court must examine the totality of the circumstances and consider "'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Mattos,* 661 F.3d at 445 (considering, *inter alia,* officers' knowledge that the plaintiff was pregnant when they tasered her) (quoting *Bryan,* 630 F.3d at 826).  The Court "must ask if the officers' conduct is '[]objectively reasonable[] in light of the facts and circumstances confronting them' without regard for an officer's

---

[5]After the incident, Plaintiff was taken to the hospital where diagnosis included a non-displaced fracture of his left elbow.  Depending on when the fracture occurred, that injury might have contributed to hampering efforts to handcuff Plaintiff.

1    subjective intentions." *Bryan,* 630 F.3d at 832 (quoting *Graham,* 490 U.S. at 396).  Although
2    the Ninth Circuit has "held that police are required to consider [w]hat other tactics if any
3    were available to effect the arrest[]",  *Id.* at 831 (internal quotation marks and citation
4    omitted), Defendants do not offer any evidence as to whether the officers considered
5    alternative tactics at any point during their encounter with Plaintiff.

6        Here, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury
7    could conclude that the force used against Plaintiff was excessive in light of the
8    governmental interests at stake.  The officers responded to a report of trespass, a relatively
9    minor offense.  By the time they arrived at La Cinderella, the store had been evacuated and
10   the doors were locked.  (*See* PSOF, Exh. 4).

11       In the span of approximately one minute, Detective Pimienta tasered Plaintiff five
12   times.  Four of the shots were deployed while Plaintiff was on the floor.  At one point,
13   Plaintiff was tasered while in a fetal position.  By the time the fifth shot was deployed, at
14   least two of the four officers had hands on Plaintiff and a third was sitting atop him,
15   straddling him.  Though the officers testified that they had difficulty handcuffing Plaintiff
16   because he straightened out his arms, there is no evidence suggesting that after falling to the
17   floor, Plaintiff fought, kicked, or attempted rise or flee.  Further, because the store was
18   locked, Plaintiff could not have escaped the officers.  Nor were any members of the public
19   present who potentially could be harmed. Additionally, Plaintiff states that he was already
20   handcuffed before the fifth taser shot.

21       Clearly, whether Plaintiff was handcuffed when the fifth shot was deployed is a
22   question of fact for the jury. Further, at oral argument, Defendants agreed with the Court's
23   statement that "if some jurors think the first [t]aser was bad, and some think only the fifth
24   [t]aser was bad..." they could still reach a verdict. (Tr. (Doc. 111), p. 33). "The witnesses on
25   both sides come to this case with their own perceptions, recollections, and even potential
26   biases. It is in part for that reason that genuine disputes are generally resolved by juries in our
27   adversarial system." *See Tolan,* __ U.S. __, 2014 WL 1757856 at *6.

28

1 **DID THE OFFICERS VIOLATE CLEARLY ESTABLISHED LAW?**

2      Here the Court must ask: "was the constitutional violation...'sufficiently clear' that

3 every 'reasonable official would have understood that what he [was] doing violate[d] that

4 right[?]'" *Mattos,* 661 F.3d at 446 (quoting *Aschcroft v. al-Kidd*, __ U.S. __, 131 S.Ct. 2074,

5 2083 (2011)). "The Supreme Court has made 'clear that officials can still be on notice that

6 their conduct violates established law even in novel factual circumstances.'" *Id.* at 442

7 (quoting *Hope,* 536 U.S. at 741); *see also Gravelet-Blondin v. Shelton,* 728 F.3d 1086, 1093

8 (9th Cir. 2013) ("[i]t does not matter that no case of this court directly addresses the use of

9 [a particular weapon]; we have held that '[a]n officer is not entitled to qualified immunity on

10 the grounds that the law is not clearly established every time a novel method is used to inflict

11 injury.'") (citations omitted). Moreover, "in an obvious case" *Graham*'s excessive force

12 "'standards can []clearly establish[] the answer, even without a body of relevant case law.'"

13 *Mattos,* 661 F.3d. at 442 (quoting *Brosseau v. Haugen,* 543 U.S. 194, 199 (2004)).

14 "Although this 'obvious case' exception remains good law, the Supreme Court recently

15 clarified that the bar for finding such obviousness is quite high. In *al-Kidd*, the Court

16 emphasized that it has 'repeatedly told courts not to define clearly established law at a high

17 level of generality. The general proposition, for example, that an unreasonable search or

18 seizure violates the Fourth Amendment is of little help in determining whether the violative

19 nature of particular conduct is clearly established.'" *Id.* (quoting *al-Kidd,* __ U.S. __, 131

20 S.Ct. at 2084)). Further, the Supreme Court "has instructed that courts should define the

21 'clearly established' right at issue on the basis of the 'specific context of the case.'" *Tolan,*

22 __ U.S. __, 2014 WL 1757856 at *4 (quoting *Saucier,* 533 U.S. at 201). The inquiry begins

23 "by looking at  the most analogous case law that existed when the officers tased..." Plaintiff

24 in July 2011. *Mattos,* 661 F.3d at 446.

25      In 2010, the Ninth Circuit found the use of a taser in dart-mode unreasonable where

26 the plaintiff was stopped:

27         for the most minor of offenses [not wearing a seat belt]. There was no
reasonable basis to conclude that [he] was armed. He was twenty feet away

28         and did not physically confront the officer. The facts suggest that [the plaintiff]

was not even facing [the] [o]fficer... when he was shot. A reasonable officer in these circumstances would have known that it was unreasonable to deploy intermediate force.

*Bryan,* 630 F.3d at 832.   Although the court indicated it did not need to find closely analogous case law to show that the right was clearly established, the court applied qualified immunity because only recent decisions had held that a taser in dart-mode constituted an intermediate use of force, and there was a dearth of prior authority. *Id.*

In October 2011, the Ninth Circuit held that a reasonable jury could find that officers used excessive force when, in less than one minute, they used stun-mode to taser the plaintiff who was seven-months pregnant, where: the plaintiff's traffic offense was minor; she did not pose an immediate threat to the safety of the officers or others; she actively resisted arrest insofar a she refused to get out of her car when instructed to do so and stiffened her body and clutched the steering wheel to frustrate the officers' efforts to remover her from her car; and she did not evade arrest by flight. *Mattos,* 661 F.3d at 445-46. However, the court applied qualified immunity because, at the time of the offense, there was no Supreme Court decision or decision of the Ninth Circuit addressing the use of taser in dart-mode. *Id.* at 448.

Plaintiff argues that "it was patently unreasonable to administer electric shock to [him] several times when he was already compliant.  No reasonable officer would think it was reasonable to administer electric shock to another person who posed no threat to anyone, was not resisting or trying to flee. The officers know the standard of *Graham*...." (Response, p. 8).  Plaintiff stresses that this is especially true regarding the fifth taser shot which he will testify was on drive-stun mode designed to inflict pain.  Plaintiff "will testify he was already cuffed when [Detective] Pimienta shocked him that last time." (*Id.*).

Defendants counter that in July 2011, there were no decisions in the Ninth Circuit or elsewhere that came close to suggesting that the officers' conduct in this case, based on the circumstances they faced, was unconstitutional or violated clearly established parameters for the use of tasers.  (Reply, p. 4).  Defendants also argue that the undisputed facts do not support Plaintiff's version that he was already complaint and posed no threat.  According to Defendants, whether Plaintiff's non-compliance was voluntary is not relevant when the

1   officers are dealing with him in the moment–especially considering Plaintiff's size and

2   behavior, and that they did not know whether he was armed.  Defendants stress there is no

3   evidence showing Plaintiff was handcuffed prior to the last taser shot.

4          The Sixth Circuit has declined to apply qualified immunity where officers beat the

5   resistant subject with a baton, tasered him unsuccessfully in dart mode and also tasered him

6   three times in quick succession in stun mode on bare skin. *Landis v. Baker,* 297 Fed.Appx.

7   453, 464, 2008 WL 4613547, *10 (6th Cir. 2008). During the tasering, the subject was in a

8   semi-prone push up-position in at least 10 inches of muddy water, with one officer kneeling

9   on his back and one arm in a handcuff.  *Id.*  The court held:

10         The defendant officers should have known that the use of a taser in stun mode,
            in rapid succession on a suspect who is surrounded by officers, in a prone
11         position in a muddy swamp, who has only one arm beneath him, and who has
            just been struck several times with a baton would be a violation of a
12         constitutional right.

13  *Id.*  The court further stated:  "Even without precise knowledge that the use of the taser

14  would be a violation of a constitutional right, the officers should have known based on

15  analogous cases that their actions were unreasonable."  *Id.*, 297 Fed.Appx. at 463, 2008 WL

16  4613547, *10 (citing *Greene v. Barber*, 310 F.3d 889, 898 (6th Cir.2002) (holding that it may

17  be excessive force to use pepper spray on suspect who was resisting arrest but "not

18  threatening anyone's safety or attempting to evade arrest by flight"), *abrogated on other*

19  *grounds by Hartman v. Moore,* 547 U.S. 250 (2006); *Vaughn v. City of Lebanon*, 18

20  Fed.Appx. 252, 266, (6th Cir.2001) (holding that the use of a chemical spray may be

21  unconstitutional when there is no immediate threat to the safety of the officers or others);

22  *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir.1994) (holding that the use of mace on a

23  compliant suspect is constitutionally unreasonable)).  Further, in the Sixth Circuit, at least

24  as of October 2006, a non-resistant suspect had a clearly established right not to be tasered.

25  *Thomas v. Plummer,* 489 Fed.Appx. 116, 2012 WL 2897007 (6th Cir. 2012) *(citing Kijowski*

26  *v. City of Niles,* 372 Fed.Appx. 595, 601 (6th Cir. 2010)).

27         Like the court in *Thomas, supra,* the District Court for the Western District of

28  Washington pointed out in 2007 that prior Ninth Circuit decisions supported the proposition

that officers may not use force when a suspect is not a threat, even if the suspect is not fully complying with officers' commands.  *See Beaver,* 507 F.Supp.2d at 1149 (taser case citing *Smith,* 394 F.3d at 703-04[6] and *Harveston v. Cunningham,* 216 Fed.Appx. 682 (9th Cir. 2007)[7]).  Although the *Beaver* court held that on the 2004 date of the incident at issue, the case law on the use of tasers was not well developed, the court went on to state:

> [h]owever, as far as the undersigned is concerned, the following issues are now clearly established. First, the use of a Taser involves the application of force. Second, each application of a Taser involves an additional use of force. Third, multiple applications of a Taser cannot be justified solely on the grounds that a suspect fails to comply with a command, absent other indications that the suspect is about to flee or poses an immediate threat to an officer. This is particularly true when more than one officer is present to assist in controlling a situation. Fourth, any decision to apply multiple applications of a Taser must take into consideration whether a suspect is capable of complying with an officer's commands.

*Id.* at 1149.  Additionally, in 2012, the District Court for the Eastern District of Washington denied summary judgment on qualified immunity where the plaintiff, who claimed he was not actively resisting and verbally surrendered, was tasered and slammed to the ground in December 2011. *Bailey v. Chelan County,* 2012 WL 4756068 (E.D. Wash. Oct. 5, 2012).

The determination turns on whether "the state of the law [at the time of the incident] ... gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional."  *Hope,* 536 U.S. at 741.  Given the state of the law in July 2011, the officers should have known that use of a taser could constitute unreasonable force, *see Bryan,* 630 F.3d at 832, which was decided by the Ninth Circuit in 2010.  Further, prior to the Defendant officers' encounter with Plaintiff, the officers should have been aware that they

---

[6]In *Smith,* decided in 2005, the Ninth Circuit held that a jury could reasonably find excessive force where the plaintiff did not attack or threaten the officers but did not comply with command to place his hands on his head and the officers used four blasts of pepper spray, slammed the plaintiff down onto a porch, dragged him off the porch face down, and released a police dog against him while he was already pinned to the ground.

[7]In *Harveston*, decided in 2007, the Ninth Circuit found that an officer used excessive force when he used pepper spray against a suspect who was already handcuffed and on the ground, but trying to roll over.

1    may not use force against a suspect who is not a threat, even where the suspect is not fully

2    complaint. *See e.g., Id.*; *Smith,* 394 F.3d at 703-04;  *Harveston,* 216 Fed.Appx. 682.

3          The Court can decline to enter summary judgment on a qualified immunity claim

4    where there are disputed issues of fact as to what the officer knew and did or failed to do.

5    *See Act Up!/Portland v. Bagley,* 988 F.2d 868, 873 (9th Cir. 1993) ("[i]f a genuine issue of

6    fact exists preventing a determination of qualified immunity at summary judgment, the case

7    must proceed to trial."). Here, Plaintiff was on the floor after the first taser shot and, before

8    the final shot, he  states that he was handcuffed and that he told Detective Pimienta that he

9    suffered from a seizure disorder and there was no need to taser him. Crediting Plaintiff's

10   evidence, whether he  posed a threat initially or continually, whether he resisted, whether

11   before the fifth taser shot he was already handcuffed and had told officers about his seizure

12   disorder and that there was no need to taser him are all questions of fact for the jury's

13   determination.   If Plaintiff did not pose a threat and/or was not actively resisting and/or was

14   handcuffed and/or had indicated that he would comply, then repeatedly tasering him was a

15   violation of clearly established law. *See e.g., Bryan,* 630 F.3d at 832; *Beaver,* 507 F.Supp.2d

16   at 1149.   Defendants' Motion for Summary Judgment should be denied on the issue of

17   qualified immunity.

18   **WHETHER THE CITY OF NOGALES HAD A CUSTOM OR PRACTICE OF TASERING PEOPLE**

19   **INDISCRIMINATELY**

20         Plaintiff contends that the City of Nogales ("City") is liable because it had a custom

21   or practice of tasering indiscriminately. (Response, p. 8). As of July 2011 when the incident

22   at issue occurred, the City had a "Use of Force" policy which, in pertinent part, specifically

23   discussed tasers as follows:

24         The Taser will not be used in the following circumstances:...(2) On subjects
           who are handcuffed, unless they are physically violent and uncontrollable
25         by lesser applications of force; (3) On subjects who are under control of an
           officer and are not physically resisting; (4) On subjects who are under the
26         control of an officer and pose no immediate threat of violence to self or
           others.

27
     (PSOF, Exh. 15, p. 1681).  Plaintiff argues that "the Defendant officers testified that it was
28

their custom and habit to 'Taser a subject until compliant.'" (Response, p. 9 (citing PSOF, Exh. 7, p. 72)).  Plaintiff's citation is to Detective Pimienta's deposition testimony that he could taser a suspect an unlimited number of times until he achieved compliance.  (PSOF, Exh. 7, pp. 72-73 (Detective Pimienta also testified that he did not receive training as to whether there is a limit to the number of cycles of repetitive taser shots to which a suspect should be exposed)).  According to Plaintiff, the officers did not stop after each taser shot to evaluate the situation to determine whether Plaintiff was still a threat, was actively trying to avoid arrest or escape or was otherwise complaint.  Plaintiff cites the *Mattos'* court's observation that the rapid succession of three taser shots in a drive-stun mode "provided no time for [plaintiff] to recover from the extreme pain she experienced, gather herself, and reconsider her refusal to comply."  *Mattos,* 661 F.3d at 445.

A municipality is liable for unconstitutional acts of its officials or employees when those acts implement or execute an unconstitutional municipal policy or custom.  *Monell v. Dep't. of Soc.Servs. of N.Y.*, 436 U.S. 658, 694 (1978).  The policy must result from a deliberate choice made by a policy-making official, and may be inferred from widespread practices or "evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded." *Gillette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir.1992); *see also Oviatt v. Pearce,* 954 F.2d 1470, 1477-78 (9th Cir. 1992).  Consequently, "[a] plaintiff cannot prove the existence of a municipal policy or custom based solely on the occurrence of a single incident of unconstitutional action by a non-policymaking employee." *Davis v. City of Ellensburg*, 869 F.2d 1230, 1233 (9th Cir.1989).  Nor can municipalities "be held liable simply because they employ a tortfeasor."  *Id.* (citing *Monell*, 436 U.S. at 691).

Other than Detective Pimienta's opinion that he can taser a subject until the subject is compliant, Plaintiff has cited no evidence suggesting that the City had a custom or practice of tasering people indiscriminately or that previous incidents violating the City's taser policy had occurred for which the offending officers were not discharged or reprimanded. *See Davis,* 869 F.2d at 1235 ("[Plaintiff] failed to present any evidence of other acts by ... police officers to prove that the use of excessive force is a widespread practice or custom in the city.

1    Thus,...” the court could not infer “that the use of excessive force is sufficiently pervasive

2    to rise to the level of a custom of the City.”)).  Plaintiff has not established a genuine issue

3    of material fact on this issue.

4    **ADA CLAIMS (Claim 2).**

5        Plaintiff makes two ADA claims: (1) that his wrongful arrest was an act of

6    discrimination based on his disability; and (2) the City of Nogales never trained its

7    employees or instituted policies to accommodate disabled individuals such as Plaintiff by

8    giving firefighters and police officers the tools and resources to handle interactions between

9    those responders and disabled individuals peacefully.  (Response, p. 10).  To recover

10   monetary damages under the ADA, a plaintiff must prove intentional discrimination on

11   behalf of the defendants.  *Duvall v. County of Kitsap,* 260 F.3d 1124, 1138 (9th Cir. 2001).

12   Such a showing requires proof that the defendants acted with deliberate indifference, which

13   “requires both knowledge that a harm to a federally protected right is substantially likely, and

14   a failure to act upon that the likelihood.”  *Id.*  (citation omitted).

15   **WRONGFUL ARREST**.  “Courts have recognized at least two types of [ADA]... claims

16   applicable to arrests: (1) wrongful arrest, where police wrongly arrest someone with a

17   disability because they misperceive the effects of that disability as criminal activity; and (2)

18   reasonable accommodation, where, although police properly investigate and arrest a person

19   with a disability for a crime unrelated to that disability, they fail to reasonably accommodate

20   the person's disability in the course of investigation or arrest, causing the person to suffer

21   greater injury or indignity in that process than other arrestees.”  *Sheehan,* 743 F.3d at 1232

22   (citation  omitted); *see also Gohier v. Enright,* 186 F.3d 1216, 1222 (10th Cir. 1999) (citing

23   *Lewis v. Truitt,* 960 F.Supp. 175 (S.D. Ind. 1997); *Jackson v. Inhabitants of Town of Sanford,*

24   1994 WL 589617, *12 (D.Me. Sept. 1994)); *Otioti v. Arizona,* 2008 WL 7069009 (D. Ariz.

25   Aug. 19, 2008) (“Because the Ninth Circuit has made clear that the ADA applies to anything

26   a public entity does and has indicated its unwillingness to carve out categorical exceptions

27   to the ADA in the areas of arrests, detention, and parole, the Court concludes that [an officer

28   tasering and shooting  a deaf man on the roadside who did not respond to the officer’s

1   inquiries]...does not fall outside the scope of the ADA.") (internal quotation marks and

2   citation omitted)). In holding that the ADA applies to arrests, the Ninth Circuit has

3   emphasized "that exigent circumstances inform the reasonableness analysis under the ADA,

4   just as they inform the distinct reasonableness analysis under the Fourth Amendment."

5   *Sheehan,* 743 F.3d at 1232 (citation omitted).  Courts have held that a plaintiff may recover

6   based on a theory of wrongful arrest where the police misperceived the effects of a disability

7   as criminal activity, where the plaintiff "can show that: (1) he was disabled, (2) the

8   defendants knew or should have known he was disabled, and (3) the defendants arrested him

9   because of legal conduct related to his disability." *Lewis,* 960 F.Supp. at 178 (citations

10   omitted).

11       Plaintiff argues that the City had a legal obligation to train its officers to recognize the

12   signs and symptoms of disability in the field and because the City failed this duty, the

13   officers created exigent circumstances through their own conduct. (Response, p. 12). "Here

14   there was no exigency until the police arrived, ill-informed and unwilling to do any pre-entry

15   inquiry via the witness standing outside[]", which includes La Cinderella store employees.

16   (*Id.*).

17       Defendants point out that force was not used because Detective Pimienta

18   misconceived the lawful effects of Plaintiff's disability as criminal conduct.  Instead, Plaintiff

19   trespassed into the warehouse area of La Cinderella Store "and his subsequent assaultive

20   behavior towards Officer Fierros were not lawful."  (MSJ, p. 9-10).

21       Police responded to a dispatch about a "disoriented" male having trespassed into the

22   warehouse area at La Cinderella store.  Had officers spoken to the store employees, they

23   would have possibly learned that Plaintiff had a "lost–glazed..."  look and appeared

24   disoriented as if he had been drinking or was on drugs.  (DSOF, Exh. 16, pp. 19-20).  Even

25   assuming the officers had heard the dispatch about reports of a disoriented male in the area

26   earlier, they would not know the reason why the subject was disoriented.  As to the trespass,

27   "the officer[s] did not misperceive lawful conduct caused by [Plaintiff's]...disability as

28   criminal activity and then arrest him for that conduct. [Plaintiff's] conduct was not lawful...."

1   *Gohier,* 186 F.3d at 1222.   Moreover, Detective Pimienta did not initially use force to effect

2   an arrest, instead he defended against a perceived threat to Officer Fierros.   *Id.*   While

3   Plaintiff argues that the manner in which the officers approached him caused him to run

4   toward Officer Fierros due to being in a postictal state, on the instant record there are no facts

5   suggesting that the Defendant officers should have known that Plaintiff was in fact epileptic

6   and in a postictal state when they encountered him. Plaintiff fails to present evidence creating

7   a question of material fact on this issue.[8]   This is especially so given Dr. Labiner's testimony

8   that an epileptic in a postictal state "can appear intoxicated, on drugs, things like that.   They

9   just don't look normal.   And that's really where the dilemma comes in, because obviously

10   you treat somebody who is intoxicated and potentially a danger to you differently than you

11   would treat somebody else.   And that's why I mentioned earlier that I don't envy law

12   enforcement for having to do that on the fly."   (PSSOF, Exh. 20, pp. 68-69).

13   **FAILURE TO TRAIN**.   Plaintiff argues that the City made no effort "to appropriately comply

14   with the constitutional protections afforded each disabled citizen under the ADA.   To do

15   nothing would lead to continued discrimination based on disability."   (Response, p. 13).

16   According to Plaintiff, the City waited nearly 20 years after the 1990 enactment of the ADA

17   to develop a written policy.   "All of [the] EMTs and police officers testified that they

18   received *no* ADA training."   (*Id.* (citing PSOF, ¶15) (emphasis in original)).   For support,

19   Plaintiff cites the following exchange with Detective Pimienta at his deposition:

20   Q. I just want to make sure we're agreeing....The very same thing that
    happened to Diego on July 12, 2011, would have happened to him if you had
21   known he was an epileptic and he had resisted as he, in fact resisted?
    A.[Detective Pimienta]:      That is correct.

22   (PSOF, Exh. 7, p. 185).

23   The cited testimony does little to aid Plaintiff given that the question did not ask how

24

25   ─────────────────

26   [8]Plaintiff also alleges that the City failed to train the officers, which the Court
    discusses *infra.*   For purposes of Plaintiff's wrongful arrest claim, however, there is no
27   evidence in the record suggesting that even had the officers received ADA training
    specifically regarding epilepsy, they should have known that Plaintiff was in fact epileptic
28   and in a postictal state when they encountered him.

the officers would have treated Plaintiff had they known he was in a postictal state.

In considering the ADA, the House Judiciary Committee stated:

> In order to comply with the non-discrimination mandate, it is often necessary to [train] public employees about disability. For example, persons who have *epilepsy,* and a variety of other disabilities, are frequently inappropriately arrested and jailed because police officers have not received proper training in [how to recognize and aid people having] seizures.... Such discriminatory treatment based on disability can be avoided by proper training.

*Gohier,* 186 F.3d at 1221-22 (quoting H.R.Rep. No. 101–485, pt. III (1990), *reprinted in* 1990 U.S.C.C.A.N. 445)) (emphasis added).

Because the Ninth Circuit has not set forth a standard for failure-to-train claims under the ADA, courts analogize to such claims brought under §1983.  *Green v. Tri-Country Metropolitan Transp. Dist. Of Oregon,* 909 F.Supp.2d 1211, 1220-21 (D.Or. 2012).  "'A claim of failure to train requires the plaintiff to show that the failure to provide adequate training or supervision amounts to a policy or custom evidencing a deliberate indifference to the rights of persons with whom the police come into contact. *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 380 (1989); *see also Merritt v. County of Los Angeles*, 875 F.2d 765, 770 (9th Cir.1989).'" *Id.* at 1220-21 (quoting *Carr v. City of Hillsboro,* 497 F.Supp.2d 1197, 1210 (D.Or. 1997)); *see also Sheehan,* 743 F.3d at 1230. Under this test, the plaintiff must establish "a program-wide inadequacy in training." *Alexander v. City and County of San Francisco,* 29 F.3d 1355, 1367 (9th Cir.1994). The plaintiff "cannot simply allege a specific type of training that he believes the officers should have had."  *Green,* 909 F.Supp.2d at 1221.

As to training the officers received regarding dealing with disabled subjects, Detective Pimienta testified that when the Police Department implemented its ADA policy, the policy was attached to a memo and officers "signed off on the policy, you dated it, you gave that memo back, and then you put those papers that you were supposed to read into your policy manual[;]" there was no meeting to explain or discuss the policy.  (PSOF, Exh. 7, p. 81). Officer Ortega's testimony was similar to Detective Pimienta's.  (PSOF, Exh. 11, p. 28). Officer De La Ossa testified that he had not seen an ADA policy, he did not receive any

1   training about what to do to determine whether a suspect is suffering from a disability, nor

2   has he received training about how to recognize the signs and symptoms of epilepsy. (PSOF,

3   Exh. 6, pp. 10-11, 13, 23-24).  Officer Fierros did not recall whether he had received training

4   from the police department regarding how to determine whether a suspect is actually

5   engaging in criminal conduct as opposed to suffering from a disability. (PSOF, Exh. 5, p.9).

6   Officer Fierros was not aware whether the ADA applies to police officers.  (*Id.* at pp. 9-10).

7   He had not received training regarding what happens to a person with epilepsy after he has

8   had a seizure.  (*Id.* at pp. 46-47).

9       Plaintiff acknowledges that the City had a written ADA policy and he does not raise

10  any specific objection to it.  (*See* Response, p. 13).  Plaintiff offers no expert opinion that the

11  City's policy or method of implementing  same was inadequate.  *See Green,* 909 F.Supp.2d

12  at 1221 (simply citing fact of own arrest to support failure-to-train claim "will not carry the

13  day....").  Although  Officers Fierros' and De La Ossa's testimony is especially troubling,

14  Plaintiff "must also show that the inadequate training program 'actually caused' the

15  constitutional violation."  *Green,* 909 F.Supp.2d at 1221 (quoting *City of Canton,* 489 U.S.

16  at 391).  In other words, the Court must ask:  "'Would the injury have been avoided had the

17  employee been trained under a program that was not deficient in that respect?"  *City of*

18  *Canton,* 489 U.S. at 391; *see also Green,* 909 F.Supp. 2d at 1221.  With regard to the

19  Defendant officers, the answer is "no".  As Defendants persuasively point out, Dr. Labiner

20  testified that people in a postictal state can appear intoxicated or on drugs and "[t]hey just

21  don't look normal."  (Reply, p. 9; PSSOF, Exh. 20, p. 68)).  He went on to state: "[T]hat's

22  really where the dilemma comes in, because obviously you treat somebody who is

23  intoxicated and potentially a danger to you differently than you would treat somebody else.

24  And that's why I mentioned earlier that I don't envy law enforcement for having to do that

25  on the fly." (PSSOF, Exh. 20, p. 68).  The evidence of record does not create a genuine issue

26  of material fact as to whether different training would have led the officers to conclude that

27  the disoriented male, who was sweating profusely with labored breathing, dilated pupils,

28  clenched fists, and a smile-like expression on his face, whom they encountered trespassing

- 28 -

at La Cinderella's warehouse was in a postictal state versus being intoxicated or high on drugs.

Review of EMT Boyd's deposition reflects that he did not believe the City had any ADA policies, "[b]ut I think just out of our training as EMTs and paramedics, there is [sic] I guess, policies on how to–I guess, on how to treat people with disabilities a little more patient or whatnot...." (PSOF, Exh. 2, p.9). Although Plaintiff contends the EMTs did not directly contact Plaintiff, Plaintiff does not support this assertion. Instead, Subway manager Velarde testified that the EMTs "were trying to get [Plaintiff] to talk to them." (PSOF, Exh. 1, p.26). This is consistent with EMT Boyd's version.

EMT Boyd, who is familiar with persons in a post-seizure, postictal state, testified that such a person is usually physically unsteady, with a blank facial expression, disoriented, "[a]nd when you do ask them questions, most of the time they'll just kind of sit there." (DSOF, Exh. 2, p. 91). According to EMT Boyd, when he encountered Plaintiff, Plaintiff was not unsteady on his feet and did not appear disoriented. (*Id.* at pp. 89, 92). Concluding that he was unable to locate the person who was the subject of the 911 call, EMT Boyd and his partner drove away without making any further inquiry. (*Id.* at p. 44, 93; *see also id* at p. 87 (An EMT or paramedic cannot force a person to receive care)).

Plaintiff relies on testimony from Dr. Labiner that Plaintiff's normal gait, as observed by EMT Boyd, is insignificant because "[m]any if not most people who have brief seizures would be able to ambulate in the aftermath." (PSSOF, Exh. 20, p. 36). Dr. Labiner also testified that "it sounds pretty clear that [during the encounter with EMT Boyd and thereafter, Plaintiff] was in a postictal state. It's not normal to just go running into someplace and not pay attention to people who are hollering at you and things." (*Id.* at p. 35). Plaintiff challenges EMT Boyd's testimony that Plaintiff did not appear disoriented. Plaintiff relies on: (1) Velarde's testimony that after the seizure, Plaintiff "stood up, he looked like he was lost, I guess, and opened the door [of Subway] and walked out[]" (PSOF, Exh. 1, pp. 16-17); and (2) the 911 transcript indicating that Plaintiff was disoriented when he left Subway. (DSOF, Exh. 1).

1    EMT Boyd's lack of knowledge regarding the ADA is very troubling.  However, the

2    record is scant with regard to the City's alleged lack of training for EMTs and whether EMT

3    Boyd's experience is a widespread practice.  *See City of Canton,* 489 U.S. at 390-91 (That

4    a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on

5    the city, for the officer's shortcomings may have resulted from factors other than a faulty

6    training program).  Summary judgment should be granted on this issue.

7    **STATE LAW CLAIMS**

8    Defendants seek summary judgment on all of Plaintiff's state law claims. (MSJ, pp.

9    13-15).

10   **ASSAULT & BATTERY ALLEGED AGAINST DEFENDANT POLICE OFFICERS (CLAIMS 3 & 4).**

11    Defendants point out that officers are entitled to use reasonable force.  ARS §13-409.  They

12   argue there is no evidence that the force used was unreasonable.  They also argue that there

13   was no unauthorized touching because the officers were authorized to physically detain

14   Plaintiff.  In light of the factual issues surrounding the encounter in the warehouse, *see supra,*

15   summary judgment should be denied on these claims.

16   **NEGLIGENCE (CLAIM 5).**  Defendants contend the officers' conduct was reasonable under

17   *Graham*, and therefore, any negligence claim fails.  Because factual questions remain for the

18   jury's determination whether the Defendant officers' conduct was reasonable, summary

19   judgment should be denied on this issue.

20   Plaintiff agrees that any claim against the EMTs must allege gross negligence[9].  (Tr.

21

22   [9]"A party is grossly or wantonly negligent if he acts or fails to act when he knows or

23   has reason to know facts which would lead a reasonable person to realize that his conduct not

24   only creates an unreasonable risk of bodily harm to others but also involves a high
     probability that substantial harm will result....Gross negligence differs from ordinary

25   negligence in quality and not degree." *Walls v. Arizona Dept. Of Public Safety,* 170 Ariz.
     591, 595, 826 P.2d 1217, 1222 (App. 1991). The Arizona Supreme Court has described gross

26   or wanton negligence as follows: "'Wanton negligence is highly potent, and when it is
     present it fairly proclaims itself in no uncertain terms. It is []in the air,[] so to speak. It is

27   flagrant and evinces a lawless and destructive spirit.'"  *Id.* (quoting *Scott v. Scott,* 75 Ariz

28   116, 122, 25 P.2d 571, 575 (1953)).

1   at p. 28).  "[O]rdinarily, the issue of gross negligence is a question of fact to be decided by

2   the jury."  *Luchanski v. Congrove,* 193 Ariz. 176, 180, 971 P.2d 636, 640 (App. 1998)

3   (quoting *Walls,* 170 Ariz. at 595, 826 P.2d at 1221).  "To present the issue to the jury, gross

4   negligence need not be established conclusively, although the evidence must be more than

5   slight and may not border on conjecture."  *Id.*  Viewing the facts favorably to Plaintiff, the

6   evidence is that Velarde pointed Plaintiff out to the EMTs as the seizure victim.  Yet, the

7   EMTs did nothing after Plaintiff, who was non-responsive to their inquiries, walked away

8   from them. They did not even bother to get out of the ambulance to question or assess the

9   subject who had been specifically pointed out to them as the person who had suffered a

10  seizure moments earlier.  Nor, in order to gain a better assessment of the situation, did the

11  EMTs bother to seek details from Velarde.  Reasonable jurors could find that the EMTs'

12  failure to leave the ambulance to question or assess Plaintiff rises to the level of gross

13  negligence.

14          Defendants correctly point out that Plaintiff failed to allege gross negligence against

15  the EMTs.  Given that Defendants have had fair notice of Plaintiff's claim, Plaintiff should

16  be granted leave to amend the FAC on this issue.

17  **INADEQUATE TRAINING (CLAIM 6).** Defendants argue that Claim 6 should be dismissed

18  because the Nogales Police Department is the sole named Defendant,  and municipal police

19  departments are non-jural entities. (MSJ, p. 14).  Under Rule 17 of the Federal Rules of Civil

20  Procedure, the capacity of an entity other than an individual or corporation to sue or be sued

21  is governed by the law of the state in which the district court is located.  In Arizona, a

22  government entity may be sued only if the legislature has given that entity power to be sued.

23  *Payne v. Arpaio*, 2009 WL 3756679, *4 (D.Ariz. Nov. 4, 2009)(involving section 1983 and

24  ADA claims)(citations omitted). The District Court for the District of Arizona has noted that

25  there is a consensus that city police departments are non-jural entities that may not be sued

26  in their own names.  *Id.*  Accordingly, this claim should be dismissed.

27  **NEGLIGENT SUPERVISION (CLAIM 7).**  To be liable for negligent hiring, retention, or

28  supervision of an employee, the court must find that the employee committed a tort. *Mulhern*

1   *v. City of Scottsdale*, 165 Ariz. 395, 398, 799 P.2d 15, 18 (App.1990). "If the theory of the

2   employee's underlying tort fails, an employer cannot be negligent as a matter of law for

3   hiring or retaining the employee." *Kuehn v. Stanley,* 208 Ariz. 124, 130,  91 P.3d 346, 352

4   (App.2004) (citation omitted). Defendants argue that there is no evidence to support this

5   claim and that the standard regarding the EMTs is gross negligence. Plaintiff indicates he has

6   nothing to add other than to point out Defendants' concession that there is *respondeat*

7   *superior* liability on state claims.  (Response, p. 15; *see also* MSJ, p. 15).  As with Plaintiff's

8   claims of assault, battery, and negligence, factual questions as to whether the Defendant

9   officers and EMTs committed a tort make this claim inappropriate for summary judgment.

10  **INFLICTION OF EMOTIONAL DISTRESS (CLAIM 8).** To establish intentional infliction of

11  emotional distress, Plaintiff must show: (1) the conduct by the defendant was extreme and

12  outrageous; (2) the defendant must either intend to cause emotional distress or recklessly

13  disregard the near certainty that such distress will result from his conduct; and (3) severe

14  emotional distress must indeed occur as a result of defendant's conduct. *Ford v. Revlon,* 153

15  Ariz. 38, 43, 734 P.2d 580, 585 (1987).   Plaintiff argues that he suffered severe emotional

16  distress and PTSD as a result of the taser in drive-stun mode. Plaintiff cites generally to the

17  deposition from Brian Walker, Ph.D., his treating  psychologist, reflecting he has diagnosed

18  Plaintiff with PTSD. (PSOF, Exh. 3, p. 73).  Plaintiff argues that whether the tasering did in

19  fact cause emotional distress of such severity so as to entitle  him to damages is a question

20  for the jury.  (Response, p. 15).  On the instant record, there is clearly enough evidence on

21  the first and second elements to raise a genuine issue of material fact for the jury's

22  consideration.  Further, absent more analysis from Defendants as to why the third element

23  is lacking, the Court finds that Plaintiff has sufficiently satisfied his burden to point to

24  evidence creating a genuine issue of material fact. *See Celotex,* 477 U.S. 317. However, to

25  obtain a jury instruction on this issue, more specific information as to the severity of the

26  distress and causation will be necessary at trial.   Nonetheless, at this point, summary

27  judgment on this issue should be denied.

28

**VICARIOUS LIABILITY (CLAIM 9).** The parties agree that there is no *respondeat superior* liability on the §1983 claim.  Although there is such liability on the ADA claims, Defendants correctly contend that the issue is moot given that they are entitled to summary judgment on those claims.  The parties agree that "[t]here is *respondeat superior* liability on the state law claims."  (MSJ, p. 15).  Therefore, entry of summary judgment on Claim 9 relates only to the federal claims.

**EXEMPLARY DAMAGES (CLAIM 10).** Defendants contend punitive damages are barred by statute on state law claims.  A.R.S. §12-820.04.  Plaintiff argues that if the jury believes he was handcuffed and in custody before the fifth taser shot, the jury can conclude that the only reason for that last taser was to inflict pain which constitutes torture.  According to Plaintiff, it is up to the jury to determine whether the fifth taser shot occurred and whether it occurred within the course and scope of Detective Pimienta's employment with the City.  There are questions of fact as to whether Plaintiff was handcuffed, and whether he told officers he would comply and they did not need to taser him that last time.  Summary judgment should be denied on this claim.[10]

**RECOMMENDATION**

For the foregoing reasons, the Magistrate Judge recommends that the District Court, after its independent review, grant in part and deny Defendants' Motion for Summary Judgment (Doc. 96).  Defendants' Motion should be granted to the extent they seek summary judgment on Plaintiff's claims:

> (1)   that the City of Nogales had a custom or practice of tasering people indiscriminately in violation of 42 U.S.C. § 1983 (portion of Claim 1);

---

[10]If Plaintiff wishes to pursue the theory that Defendant Pimienta was acting outside the course and scope of his employment, then the statutory bar on exemplary damages would not apply.  Such a theory complicates the case and the various parties' interests given that such an approach could possibly take Defendant Pimienta outside the scope of coverage available by the State's risk management statutes.  *See e.g. State v. Schallock,* 189 Ariz. 250, 941 P.2d 1275 (1997); *State v. Heinze,* 196 Ariz. 126, 993 P.3d 1090 (App. 1999).  Of course, this is a decision that must be determined by Plaintiff's counsel.

1     (2)     under the ADA (Claim 2);

2     (3)     of negligence (Claim 5) alleged against the EMTs only;

3     (4)     of inadequate training (Claim 6);

4     (5)     of vicarious liability (Claim 9) as to the federal claims only (the parties do not

5             dispute that Claim 9 remains as to the state law claims); and

6     (6)     for exemplary damages (Claim 10) except as to Defendant Pimienta.

7   Defendants' Motion should be denied to the extent that they seek summary judgment on

8   Plaintiff's claims of:

9     (1)     excessive force in violation of 42 U.S.C. § 1983 (portion of Claim 1);

10    (2)     assault (Claim 3);

11    (3)     battery (Claim 4);

12    (4)     negligence (Claim 5) as to the police officers;

13    (5)     negligent supervision (Claim 7);

14    (6)     intentional infliction of emotional distress (Claim 8); and

15    (7)      entitlement to exemplary damages as to Defendant Pimienta (Claim 10).

16          Additionally, the Magistrate Judge further recommends that Plaintiff should be

17  granted leave to amend the complaint to allege gross negligence as to the EMTs.

18          Pursuant to 28 U.S.C. §636(b) and Rule 72(b)(2) of the Federal Rules of Civil

19  Procedure and LRCiv 7.2(e), Rules of Practice of the U.S. District Court for the District of

20  Arizona, any party may serve and file written objections within fourteen (14) days after being

21  served with a copy of this Report and Recommendation.  A party may respond to another

22  party's objections within fourteen (14) days after being served with a copy. Fed.R.Civ.P.

23  ////

24  ////

25  ////

26  ////

27  ////

28  ////

72(b)(2).  No replies to objections shall be filed unless leave is granted from the district court to do so. If objections are filed, the parties should use the following case number: **CV 12-518-TUC-FRZ.**

DATED this 19th day of May, 2014.

**CHARLES R. PYLE**
**UNITED STATES MAGISTRATE JUDGE**